[Cite as *State v. Sanders*, 2015-Ohio-5232.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS.  C-140579 |
| | | C-140580 |
| Plaintiff-Appellee, | : | TRIAL NOS.  B-1300037 |
| | | B-1305979 |
| vs. | : | |
| DEANGELO SANDERS, | : | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal:  December 16, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Chief Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.

Please note:   these consolidated cases have been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1}    Defendant-appellant Deangelo Sanders appeals from his convictions, following a jury trial, for the aggravated robbery and aggravated felony murder of Jeffrey Luttrell and Joseph Payne.  Sanders and Ryan Collier arranged to meet Luttrell and Payne, ostensibly to sell them crack cocaine.   While sitting in the back seat of Payne's Chevrolet Blazer, Sanders and Collier robbed their victims, and when they resisted, shot Payne and Luttrell from behind, killing Luttrell instantly.  Payne later died of his wounds.

{¶2}    Sanders argues in six assignments of error that the trial court erred by admitting hearsay evidence, and permitting the state to impeach its own witness with his prior inconsistent statements,   the prosecution committed misconduct in closing argument, he was denied the effective assistance of counsel, his convictions were contrary to the manifest weight of the evidence and were based upon insufficient evidence, and the trial court erred by imposing multiple punishments for one course of criminal conduct. We find none of the assignments to have merit and affirm the trial court's judgment.

### I.    The Murder of Payne and Luttrell

{¶3}    On the morning of November 1, 2012, Payne, a resident of Casey County, Kentucky, cashed his disability check in the amount of $628.20.  Payne, a user of cocaine and heroin, and Luttrell then left for Cincinnati in Payne's 1997 Chevrolet Blazer to purchase drugs.  That afternoon Payne spoke with his wife, Cheryl, by telephone.  She told him that someone from the Cincinnati area code had called their home.  Payne responded that the caller was his "hookup."

{¶4}    That afternoon, Sanders and Collier had encountered Payne and Luttrell on Harrison Avenue.  They had arranged to purchase drugs from Sanders and Collier.  The four agreed to meet behind a building at 2247 Harrison Avenue, in the Westwood neighborhood of Cincinnati.  A surveillance camera located on a nearby apartment building recorded a gold Mazda 626 arrive and park in the

2

complex's lot located at 2201 Harrison Avenue. Two male African-Americans exited from the vehicle and walked in the direction of the 2247 Harrison Avenue lot. Both were wearing dark-colored hooded sweatshirts. A few minutes later, a nearby resident saw two African-American males talking to two men sitting in Payne's Blazer. Payne was seated in the driver's seat; Luttrell was in the front passenger's seat with his seat belt buckled. Both Collier and Sanders are African-Americans.

{¶5} The resident then heard two heard two gunshots and saw the two African-American males running from the scene. At 4:02 p.m., the apartment surveillance system recorded the hooded males running back to the gold Mazda. The two sat in the vehicle for a few moments. The passenger then exited from the car and threw a black hooded sweatshirt into a nearby dumpster. The two departed, only to return at 4:30 p.m. The passenger retrieved the black garment, searched its pockets, and threw it into the nearby woods, where it was found. Subsequent investigation detected Collier's DNA on the black hooded sweatshirt.

{¶6} Responding to the apartment resident's 911 telephone call, Cincinnati police officers found Luttrell, still buckled into his seat, dangling from the front passenger seat. He had been shot in the back and was dead. The fatal shot had come from approximately 18 inches away. Payne was lying, face up, near the rear of the Blazer on the driver's side. He had been shot in the neck, also from behind. He was bleeding heavily, had no feeling in his legs, and had difficulty talking and breathing. The officers spoke with Payne. As a result of their inquiry, they reported that the perpetrators of the shooting were two armed, male African-Americans. Only $100 was found in Payne's wallet. Payne, paralyzed from the neck down, succumbed to his wounds in August 2013.

{¶7} The investigating officers found a single spent 9 mm shell casing near the rear of the vehicle. A small amount of cocaine was located in the Blazer's central console. A DNA sample taken from the driver's side rear door handle was analyzed.

Collier was excluded as a possible match for the sample. But the serologist conducting the test could not exclude Sanders as the person who had deposited DNA on the door handle.

{¶8} Five days later, police located the gold Mazda 626. It belonged to Collier's brother Joshua, although Collier frequently used the vehicle. Police recovered a blue hooded sweatshirt from the back seat. Sanders' DNA matched samples taken from the sweatshirt. The garment also tested positive for gunshot residue.

{¶9} Investigators then arrested Collier and executed a search warrant at his apartment in the 2200 block of Harrison Avenue. They found a holster and ammunition for a 9 mm pistol. Police spoke with Joshua, who lived in the apartment across the hall with Gracie Gallagher, Sanders' erstwhile girlfriend. Joshua told police that Sanders and Collier were friends and often spent time together. Joshua stated that after learning about the shooting, he had entered Collier's apartment and retrieved a pistol that he had seen both his brother and Sanders use in the past. He stored the pistol in Gallagher's apartment. Joshua told police that he had moved the pistol from his brother's apartment to Gallagher's, because he did not want his brother hurting anyone else with the pistol. Police searched the apartment and located a Hi-Point 9 mm semiautomatic pistol. Ballistics tests revealed that this pistol had fired and ejected the shell casing found at the rear of Payne's Blazer. After his brother's arrest, Joshua confronted Sanders about why he remained free and Collier had been arrested. Joshua told police that he did this because he believed that Sanders had been with Collier when the shooting occurred.

{¶10} The Hamilton County Grand Jury returned two separate indictments against Sanders. In the case numbered B-1300037, Sanders was charged with one count of aggravated felony murder, in violation of R.C. 2903.01(B), and one count of murder for killing Luttrell; one count alleging the aggravated robbery of Luttrell and

4

Payne, in violation of R.C. 2911.01(A)(1), each with accompanying firearm specifications; and one count of having a weapon under a disability. Two felonious-assault charges were later dismissed. In the case numbered B-1305979, Sanders was charged with the murder and the aggravated felony murder, also under R.C. 2903.01(B), of Payne.

{¶11} Sanders had been interviewed twice by police officers and had denied any involvement in the shooting. But at trial, through his counsel, Sanders acknowledged that he and Collier had planned to sell drugs to Payne and Luttrell. Sanders maintained, however, that he had come to the drug deal unarmed and that Collier had unexpectedly, and without his knowledge, murdered Payne and Luttrell.

{¶12} The two cases were tried together over a period of seven days. After the prosecution had completed its case, the defense rested. During the trial, the jury had been informed that Collier had pleaded guilty to a criminal offense arising out of the events for which Sanders was on trial. The jury was instructed that a person who aided or abetted another to commit an offense could be held liable as if he were the principal offender, but only if the evidence had shown that he had assisted, encouraged, or incited the other person to commit the offenses.

{¶13} The jury found Sanders guilty of each offense charged in both indictments. At sentencing, the trial court merged the murder charges and entered judgment on two counts of aggravated felony murder in violation of R.C. 2903.01(B), one for each victim; one count of aggravated robbery in violation of R.C. 2911.01(A)(1), and the merged firearm specifications; and one count of having a weapon under a disability. The trial court imposed a 30-year-to-life prison sentence for each aggravated felony murder and made those terms consecutive to a maximum, 11-year prison term for aggravated robbery, a 36-month prison term for having a weapon under a disability, and a single three-year term for the merged firearm

5

specifications. The aggregate prison sentence was 77 years to life. This appeal followed.

## II. Evidentiary Issues

{¶14} Sanders raises two assignments of error challenging the trial court's admission of testimony at trial. Sanders failed to raise a timely objection to the admission of the testimony in either instance. *See* Evid.R. 103(A)(1).

{¶15} Sanders first contends that the trial court erred in admitting hearsay evidence by permitting Payne's wife to recount her husband's last words to her, that the person who had previously called was his "hookup," presumably the person that Payne had sought to buy drugs from.

{¶16} Because Sanders did not object to Cheryl Payne's statement, absent plain error in its admission, this issue has been forfeited. *See* Evid.R. 103(D); *see also* Crim.R. 52(B). Plain error is an error so extreme that it affected the outcome of the proceedings and must be corrected to prevent a manifest miscarriage of justice. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

{¶17} In light of Sanders' contention, maintained throughout the trial, that he had met Payne and Luttrell to sell crack cocaine to them, we cannot find that the admission of Payne's statement though his wife's testimony affected the outcome of the trial, or caused a miscarriage of justice. The first assignment of error is overruled.

{¶18} In his second assignment of error, Sanders contends the trial court erred by permitting the state to impeach its own witness, Joshua Collier, in violation of Sanders' right to a fair trial. Evid.R. 607 permits a party to impeach its own witness, but only upon a showing of surprise and affirmative damage. *See State v. Neal*, 1st Dist. Hamilton No. C-140667, 2015-Ohio-4705, ¶ 45. Sanders argues that, during its direct examination of Joshua, the state did not make the required showing before impeaching Joshua with his prior statement to police. The state maintains

6

that the assistant prosecuting attorney merely refreshed Joshua's recollection by showing him his prior statement while testifying. *See* Evid.R. 612; *see also State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57.

{¶**19**} At trial, Joshua testified that his brother and Sanders had both previously used the Hi-Point 9 mm pistol ultimately found in Gallagher's apartment. He stated that he had moved the pistol from his brother's apartment to Gallagher's, because he did not want his brother hurting anyone else with the pistol. After being asked if he had seen Sanders in Gallagher's apartment shortly after Payne and Luttrell had been murdered, Joshua responded, "No." For the stated purpose of refreshing his recollection, the state then showed Joshua a transcript of his statement made to police on November 7, 2012, the day that his brother had been arrested. In the statement, Joshua had told police investigators that he had seen Sanders in Gallagher's apartment three or four days prior to November 7.

{¶**20**} Despite being shown his prior statement, Joshua again stated that he had not seen Sanders in Gallagher's apartment. He maintained that he had been mistaken when he told police that he had seen him there. The assistant prosecuting attorney then began reading the police questions and Joshua's prior responses indicating that Joshua had seen Sanders in Gallagher's apartment. The assistant prosecutor ended his recitation by asking Joshua, "Do you recall that?" Joshua finally answered in the affirmative. Sanders concedes that he did not object to this conduct, and thus has forfeited all but plain error. *See* Evid.R. 103(D). Sanders cross-examined Joshua at length about his prior statement.

{¶**21**} Our review reveals that Joshua's statement was primarily used to refresh his recollection pursuant to Evid.R. 612, rather than to impeach him with a prior inconsistent statement. But the assistant prosecuting attorney did read some of Joshua's prior statements before the jury. As we noted in *Neal*, 1st Dist. Hamilton No. C-140667, 2015-Ohio-4705, at ¶ 49, this technique is "more indicative of an

impeachment technique than an attempt to refresh [the witness's] recollection * * *." *See State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996).

{¶22} But even if the state's use of the prior testimony did not fully comport with the requirements of Evid.R. 612, we are unable to conclude that Sanders' substantial rights were affected by the admission of the testimony. The precise date at which Joshua last saw Sanders in Gallagher's apartment was of little probative value. Its admission was not so extreme that it affected the outcome of the proceedings and caused a manifest miscarriage of justice. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22-23. The second assignment of error is overruled.

### III. Prosecutorial-Misconduct Issues

{¶23} In his third assignment of error, Sanders argues that the trial court erred when it allowed the state to engage in prosecutorial misconduct during closing argument. In determining whether prosecutorial misconduct has occurred, the test is whether the prosecutor's remarks were improper, "and if so, whether they prejudicially affected the accused's substantial rights." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200; *see State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). We consider the closing argument in its entirety when determining whether it prejudiced the defendant. *Slagle* at 607.

{¶24} A prosecutor is entitled to a degree of latitude in closing argument "as to what the evidence has shown and what inferences can be drawn" from that evidence. *State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). "[But] it is improper for [the] prosecutor[] to incite the jurors' emotions through insinuations and assertions that are not supported by the evidence and that are therefore 'calculated to mislead the jury.' " *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 87, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶25}   We first consider the two challenged comments to which Sanders objected at trial.  We find no impropriety associated with the state's remarks that the police were initially searching for two male blacks each armed with a gun, and that Gallagher had been Sanders' girlfriend near the time of the murders.   These comments were based on the evidence and within the latitude afforded the prosecutor in closing argument.  *See Richey* at 362.

{¶26}   Sanders did not object to the remaining comments he now challenges on appeal.  To prevail, he must establish "both that misconduct occurred and that but for the misconduct, the outcome of the trial clearly would have been otherwise."  *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.2d 1023, ¶ 109.  Sanders asserts that the two assistant prosecuting attorneys improperly commented that Sanders and Ryan Collier were always to be found together and were "partners," and that Payne and Luttrell were out-of-town "suckers."  These comments also were based on the evidence presented at trial and within the latitude afforded in closing argument.

{¶27}   Sanders also notes that the assistant prosecuting attorneys misstated the law on accomplice liability and denigrated defense counsel.  But the trial court had instructed the jury that closing argument was not evidence.  And it properly instructed the jury on accomplice liability.  None of the assistant prosecuting attorney's intemperate comments on the defense strategy, made in the state's rebuttal argument, insinuated that the defense was hiding the truth. *See, e.g., State v. Hart*, 94 Ohio App.3d 665, 674, 641 N.E.2d 755 (1st Dist.1994).  Therefore, none of the challenged comments were so prejudicial or outcome-determinative as to constitute plain error and to deny Sanders a fair trial.  The third assignment of error is overruled.

### IV. Ineffective-Assistance Claim

{¶28}   Sanders next argues that he was denied the effective assistance of counsel for various claimed deficiencies by his defense team, including counsels' failure to object to the hearsay testimony of Cheryl Payne, and to the alleged instances of misconduct in closing argument.  Sanders also questions his counsels' failure to question several of the state's witnesses, and the decision to admit, in opening argument, that Sanders was present in the Blazer to sell crack cocaine to Payne and Luttrell.  The arguments are feckless.

{¶29}   To prevail on a claim of ineffective assistance of trial counsel, Sanders must show, first, that trial counsels' performance was deficient and, second, that the deficient performance was so prejudicial that he was denied a reliable and fundamentally fair proceeding.  *See Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see also Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.  A reviewing court will not second-guess trial strategy and must indulge a strong presumption that counsels' conduct fell within the wide range of reasonable professional assistance.  *See State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

{¶30}   Here, Sanders' experienced trial attorneys worked to discredit the state's theory of the case and conducted a spirited defense. They vigorously argued that Sanders, expecting only to sell cocaine to Payne and Luttrell, had been surprised by Collier's decision to murder them, and that he had been bullied into cooperating with Collier's efforts to hide evidence and avoid arrest.

{¶31}   After reviewing the entire record, and in light of our resolution of the first and third assignments of error, we hold that counsels' efforts were not deficient, and that Sanders was not prejudiced in any way. The result of the trial was reliable and fundamentally fair.  The fourth assignment of error is overruled

### V. Sufficiency and Weight-of-the-Evidence Claims

{¶32} In his fifth assignment of error, Sanders challenges the weight and sufficiency of the evidence adduced at trial to support his convictions. Sanders was convicted of two counts of aggravated felony murder under R.C. 2903.01(B), which proscribes "purposely caus[ing] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery." A person acts purposely when he specifically intends to cause a certain result. *See* R.C. 2901.22(A); *see also State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 188. Intent to kill may be proved by inference and "may be inferred in a[n] [aggravated] felony-murder when the offense and the manner of its commission would be likely to produce death." *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995).

{¶33} The aggravated-robbery charge against Sanders was governed by R.C. 2911.01(A)(1). Under this statute, the state was required to prove that Sanders, in attempting or committing a theft offense, had a deadly weapon—here a firearm—on or about his person, and brandished or used that weapon.

{¶34} Our review of the entire record fails to persuade us that the jury, acting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We can find no basis in this record to conclude that this is that "exceptional case" in which the jury lost its way. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶35} The jury was entitled to reject Sanders' explanation, elicited through counsels' argument and cross-examination of the witnesses, that he had accompanied Collier to the parking lot simply to sell drugs to Payne and Luttrell, that he had had no knowledge of Collier's plan to rob and kill them, that Collier had been the shooter, and that he had gone along with Collier's attempts to hide evidence and

elude the police, because Sanders had been intimidated by Collier. Sanders' defense otherwise rested on highlighting inconsistencies in the state's case, on his observation that there was little physical evidence and no eyewitness testimony linking him to the crimes, and on his argument that there was no evidence indicating that he shared Collier's intent to kill Payne and Luttrell.

{¶36} But the state presented ample evidence to support the convictions, including substantial physical and testimonial evidence that Sanders and Collier had acted together and purposely killed Payne and Luttrell when they resisted the theft of the money brought to purchase crack cocaine. The testimony of Payne's wife, the investigating officers, and the assistant coroner revealed that Payne and Luttrell had travelled to Cincinnati to purchase drugs. The two encountered Collier and Sanders and arranged to meet at 2247 Harrison Avenue. Surveillance video from a nearby apartment building showed Sanders and Collier arriving together in the gold Mazda 626 belonging to Collier's brother. A witness saw them confront Payne and Luttrell. The two were seen fleeing from the scene after shots were fired. Payne, though seriously wounded, had alerted police to search for two armed African-American males.

{¶37} The surveillance camera recorded the two men fleeing in the Mazda, but returning together to retrieve and hide clothing that they had carelessly left in a nearby dumpster. The black hooded sweatshirt contained Collier's DNA. Sanders' DNA was recovered from a blue hooded sweatshirt found in the Mazda. Gunshot residue was also found on the sweatshirt. Collier's brother had removed the 9 mm pistol, which had fired the spent shell casing found near the Blazer, from Collier's apartment.

{¶38} As the weight to be given the evidence and the credibility of the witnesses were for the jury, sitting as the trier of fact, to determine in resolving conflicts and limitations in the testimony, the jury could reasonably have found that

Sanders had committed or was complicit in Collier's commission of the aggravated felony murder of Payne and Luttrell and the aggravated robbery of the victims. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶39}   When reviewing the legal sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether the evidence could have convinced any rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36; *see also Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact. *See State v. Campbell*, 195 Ohio App.3d 9, 2011-Ohio-3458, 958 N.E.2d 622 (1st Dist.).

{¶40}   Here, the record reflects substantial, credible evidence from which the triers of fact could have reasonably concluded that all elements of the charged crimes had been proved beyond a reasonable doubt, including that Sanders had killed Payne and Luttrell during an aggravated robbery and, from the manner of the killing—multiple gunshots fired from close range into the victims from behind—that Sanders had specifically intended to cause their deaths. *See State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 37; *see also Conway* at ¶ 36.

{¶41}   We note that Sanders did not argue, in his appellate brief, that his conviction for having a weapon under a disability was against the manifest weight or the sufficiency of the evidence. To receive consideration on appeal, trial-court errors must be argued and supported by legal authority and citation to the record. *See* App.R. 16(A). Errors not argued in a brief will be regarded as having been

abandoned.  *See* App.R. 12(A)(1)(b); *see also Loukinas v. Roto-Rooter Servs. Co.*, 167 Ohio App.3d 559, 2006-Ohio-3172, 855 N.E.2d 1272, ¶ 9 (1st Dist.).

{**¶42**}    The fifth assignment of error is overruled.

### *VI.  Sentencing Issues*

{**¶43**}    In his final assignment of error, Sanders claims that his sentences for aggravated robbery and aggravated murder should have been merged as allied offenses of similar import.  He also argues that the trial court failed to consider the purposes and principles of felony sentencing before imposing sentence, and that it imposed consecutive sentences without journalizing its findings in the sentencing entries.

### *a.  A Separate Animus for Purposeful Killing*

{**¶44**}    Sanders first argues that his convictions for aggravated robbery and aggravated felony murder were allied offenses of similar import subject to merger. Since, he contends, these offenses were committed neither separately nor with a separate animus, the trial court violated the requirements of Ohio's multiple-counts statute, R.C. 2941.25, by sentencing him for both offenses.

{**¶45**}    We review a trial court's merger ruling de novo.  *See State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.  Here, Sanders did not object at the sentencing hearing to the imposition of multiple sentences for these offenses.  He has therefore forfeited this issue absent a showing of plain error.  *See State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31; *see also* Crim.R. 52(B).

{**¶46**}    Under R.C. 2941.25, the merger of allied offenses occurs when the conduct of the defendant can be construed to constitute two or more allied offenses of a similar import, and this conduct shows that the offenses were not committed separately or with a separate animus.  *State v. Bailey*, 1st Dist. Hamilton No. C-

140129, 2015-Ohio-2997, ¶ 74. The review of multiple sentences under R.C. 2941.25 contemplates an evaluation of "three separate factors—the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph one of the syllabus. Separate convictions are permitted under R.C. 2941.25 for allied offenses if we answer affirmatively to one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with a separate animus or motivation? *Id.* at paragraph three of the syllabus; *see Bailey* at ¶ 76. A reviewing court may end its analysis upon an affirmative response to any of the three questions. *Bailey* at ¶ 83.

{¶47} As an initial matter, we note that Sanders' criminal conduct involved two separate victims. Thus the two aggravated-felony-murder offenses charged in the indictments—one for killing Payne, and the second for killing Luttrell—are offenses of dissimilar import and were not subject to merger with each other. *See Ruff* at paragraph two of the syllabus.

{¶48} We also hold that the aggravated-felony-murder convictions do not merge with the aggravated-robbery conviction. In *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, we reviewed the trial court's imposition of multiple sentences for aggravated felony murder and aggravated robbery. Under facts similar to those in the case at bar, the defendant had lured his victim to a parking lot to conduct a drug sale. During the transaction, the defendant robbed the victim and shot him, at close range, in the face and head, killing him. *Id.* at ¶ 3-7. We affirmed the trial court, and held that where an offender's conduct demonstrated a purpose, or specific intent, to kill while in the course of committing an aggravated robbery, the two offenses were committed with a separate animus and thus were separately punishable under R.C. 2941.25(B). *Id.* at ¶ 48.

15

**{¶49}** Here, as in *Tibbs*, the defendant was charged with aggravated felony murder, under R.C. 2903.01(B), and aggravated robbery. A guilty verdict on the aggravated-felony-murder offense required the jury to find that Sanders had the specific intent or purpose to kill. It is clear that Sanders' immediate motive in going to the parking lot was the robbery, at gunpoint, of Payne and Luttrell. But evidence of the manner in which Sanders had shot his victims from behind and at close range demonstrated a specific intent to kill, separate from the immediate motive of robbing Payne and Luttrell. *See Tibbs* at ¶ 43; *see also Garner*, 74 Ohio St. 3d at 60, 656 N.E.2d 623 (intent to kill may be inferred in an aggravated-felony-murder case when the offense and the manner of its commission would be likely to produce death).

**{¶50}** Here, as in *Tibbs*, the jury was instructed that:

[a] person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at [the] time in question there was present in the mind of [Sanders] a specific intention to cause the death of [Payne and Luttrell].

* * *

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. * * * If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life * * *, the purpose to cause the death may be, but is not required to be, inferred from the use of the weapon.

**{¶51}** The jury returned a guilty verdict on both aggravated-felony-murder offenses and the aggravated-robbery offense. The trial court entered judgments of conviction on those verdicts. And we have ratified those judgments by rejecting Sanders' weight- and sufficiency-of-the-evidence assignments of error. Since Sanders' conduct demonstrated a purpose—a specific intent—to kill while, or in the

course of, committing an aggravated robbery, the aggravated-felony-murder offenses were committed with a separate animus from the aggravated-robbery offense, and thus were separately punishable under R.C. 2941.25(B). *See Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph three of the syllabus. Thus the trial court did not err, much less commit plain error, in failing to merge the sentences for these offenses.

### b. Consideration of the Relevant Sentencing Factors

{¶52} Sanders next asserts that the trial court failed to consider the purposes and principles of sentencing before imposing sentence. The trial court must consider the purposes and principles of sentencing before imposing sentence, in accordance with the sentencing statutes, including R.C. 2929.11 and 2929.12. *See State v. Alexander,* 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 24, *overruled sub silentio in part on other grounds, State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659.

{¶53} Here, it is clear from the trial court's remarks at the sentencing hearing, and its journalized sentencing-findings worksheet, that it considered the relevant provisions of R.C. 2929.11 and 2929.12 in fashioning Sanders' sentences. The court noted Sanders' extensive record of prior felony offenses and juvenile delinquencies, and his failed attempts at rehabilitation. It noted that his victims suffered the ultimate harm, and that these offenses had been committed as part of an organized criminal activity. While the trial court also noted that Payne and Luttrell had induced or facilitated the offenses by attempting to purchase drugs, Sanders had showed no remorse for his deeds. Each of these observations is amply supported in the record.

### c. Consecutive-Sentencing Findings

{¶54}   Finally, Sanders argues that trial court failed to include consecutive-sentencing findings in the sentencing entries.  But here, the trial court stated the required findings for consecutive sentences during the sentencing hearing, journalized a sentencing-findings worksheet that included these findings, and did incorporate its consecutive-sentencing findings into the sentencing entries as required by *State v. Bonnell.*  The record of Sanders' crimes amply supports the trial court's R.C. 2929.14(C)(4) findings.   *See* R.C. 2953.08(G).   Therefore, the sixth assignment of error is overruled.

### VII. Conclusion

{¶55}   Having overruled each of Sanders' six assignments of error, we affirm the trial court's judgment in all respects.

Judgment affirmed.

**HENDON, P.J.,** and **MOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.